IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | |
|---|---|
| **Oscar Contreras Aguilar** <br> Plaintiff, | ) <br> ) <br> ) |
| v. | )      1:19cv1634 (AJT/MSN) <br> ) |
| **Phyllis Back, et al.,** <br> Defendants. | ) <br> ) <br> ) |

## MEMORANDUM OPINION

Oscar Contreras Aguilar, a federal inmate formerly housed at Northern Neck Regional Jail (NNRJ), has sued seven officers at the jail under 42 U.S.C. § 1983, principally claiming that the officers retaliated against him for engaging in protected First Amendment activity. The defendants have moved to dismiss the claims against them. [Dkt. No. 34].[1] Plaintiff has received the notice required by Local Civil Rule 7(K) and Roseboro v. Garrison, 528 F.2d 309 (4th Cir. 1975) [Dkt. No. 35], and he opposes defendants' motion [Dkt. No. 38]. For the reasons stated below, the motion will be granted with respect to the claims against Superintendent Ted Hull and the conspiracy claims against all defendants, and the motion will be denied with respect to the retaliation claims against Major Phyllis Back, Captain Jonathan B. English, Officer Ashley Veney, Officer Sigifredo Luna, Lieutenant Jason Newsome, and Sergeant Rebecca Berry.

---

[1] In the motion to dismiss, defendants construe the complaint as raising individual claims for denied access to the law library, inadequate grievance procedures, violations of the Prison Rape Elimination Act (PREA), constitutionally inadequate conditions of confinement, failure to protect, an unlawful strip search, and violations of Virginia law, in addition to retaliation and conspiracy. The motion urges the Court to dismiss each claim. Aguilar clarifies in his response opposing the motion, however, that he is bringing claims only for retaliation and conspiracy. The Court therefore will address the motion to dismiss only as it relates to the retaliation and conspiracy claims.

## I. The Complaint

The operative complaint brings claims for First Amendment retaliation and conspiracy to violate Aguilar's civil rights against the following seven NNRJ officials: (1) Superintendent Ted Hull; (2) Major Phyllis Back; (3) Captain Jonathan English; (4) Officer Ashley Veney; (5) Officer Sigifredo Luna; (6) Lieutenant Jason Newsome; and (7) Sergeant Rebecca Berry. Aguilar alleges that the defendants are aware that he has filed grievances and other § 1983 lawsuits based on his incarceration at NNRJ. [Dkt. No. 14, Amended Compl. ¶ 17]. One of the lawsuits named Lieutenant Newsome as a defendant, and Newsome's attorney kept Hull apprised of it. [Id. ¶ 16 & Ex. 25]. Additionally, Aguilar alleges that all of the defendants knew about his proclivity for filing grievances because Officer English issued a memorandum sometime prior to the first week of June 2019, directing all NNRJ staff to deny Aguilar's requests for grievance forms and to provide him with only one form every Sunday. [Id. ¶ 17].

The complaint recounts numerous alleged actions taken by the defendants, which Aguilar claims were designed to chill his protected speech. Aguilar alleges that in June 2019, he was housed in F-Pod, a general population unit, where he would help other inmates file grievances and § 1983 complaints. [Id. ¶ 19]. In July 2019, Aguilar alleges, Major Back moved him to another general population housing unit, D-Pod, even though she knew that Aguilar had "problems (beef)" with numerous inmates in that pod, including a previous altercation involving a shank just a few months earlier. [Id.]. Aguilar asserts that he asked Sergeant Berry, who, according to Aguilar, is responsible for inmate classification, to transfer him to another housing unit because D-Pod inmates were "plotting to stab him." [Id. ¶ 20]. D-Pod was then locked down for the rest of the day, and Aguilar was transferred to F-Pod the next morning. [Id.]. When Back found out, Aguilar contends, she moved him back to D-Pod—even after he reminded her that he

had "problems (beef)" with inmates there—because, Back told him, "you are persuading and helping inmates in F-Pod to file lawsuits." [Id. ¶ 21]. She then ordered guards to strip search him and to search his property. [Id.]. A few days later, Aguilar's criminal defense attorney reported to Back that Aguilar "feared for his safety" in D-Pod and would like to be moved to protective custody. [Id. ¶ 22.].

The complaint further alleges that on July 13, 2019, while Aguilar was in his cell, "D.C. gang members" tried to stab him with a shank. [Id. ¶ 23]. Aguilar says that he fought with them to gain control of the shank, was thrown down the stairs, continued fighting, and ultimately stabbed one of the gang members. [Id.]. Afterwards, Aguilar alleges, he was transferred to O-Pod, which he contends is typically "use[d] as a punishment." [Id. ¶ 24].

Aguilar was housed in federal custody between August 5, 2019 and October 23, 2019. [Id. ¶¶ 26, 28]. According to Aguilar, when he returned to NNRJ, he was placed in "'indefinite Ad Seg status' status in E-Pod," where he was permitted outside of his cell for only one hour daily. [Id. ¶ 28]. Aguilar alleges that he wrote to Officer English during the first week of November to ask to be housed in the general population. [Id. ¶ 30].

Aguilar further alleges that he filed a complaint under PREA on December 6, 2019. [Id. ¶ 32]. The following morning, Aguilar alleges, Sergeant Newsome (accompanied by two other jail employees) searched Aguilar's cell and said, "you like filing complaint huh." [Id.]. Aguilar adds that, shortly afterwards, NNRJ's PREA hotline was "blocked" by Superintendent Hull and Major Back, so that inmates can no longer access the hotline. [Id.].

Aguilar returned to federal custody from December 20, 2019 through February 10, 2020. [Id. ¶¶ 33–34]. When he came back to NNRJ, he again was placed in administrative segregation (E-Pod). [Id. ¶ 36]. He asked Officer English, again, to be placed back into general population.

3

[Id.]. English told Aguilar that the U.S. Marshals Service (U.S.M.S.) ordered Aguilar to be placed in administrative segregation. [Id.]. Aguilar contends, however, that the U.S.M.S. denied giving that directive. [Id.].

Aguilar further alleges that Officer English ultimately authorized his transfer to O-Pod on February 24, 2020. [Id. ¶ 38]. Aguilar contends that, after the transfer, "all of a sudden, 4 D.C. gang members were also moved to O-Pod," even though English knew Aguilar was "beefing with D.C. gang members." [Id.]. Aguilar says that he wrote to English to ask for a housing transfer, explaining that he was feeling "homicidal" and "did not get along with the D.C. gang members." [Id. ¶ 40]. In response, Aguilar alleges, English placed him in "ad seg status," where he remains indefinitely. [Id.].

Additionally, Aguilar alleges that on March 16, 2020, he received permission to have the law library brought to his cell, but after thirty minutes of using it, Officer Veney, accompanied by Officer Luna and two other guards, came to his cell, "yelled 'I smell smoke,'" and ordered him to "cuff up." [Id. ¶ 50]. Aguilar alleges that Luna and the other two guards proceeded to search his cell for 35–40 minutes, during which they read his legal paperwork and took a grievance form that Aguilar had filled out. [Id.]. When the officers finished, they removed the law library from Aguilar's cell and Veney allegedly told Aguilar it was because Aguilar had been smoking, even though Aguilar denied doing so. [Id.]. Afterwards, Aguilar adds, Veney told Luna and the other guards to search the other two cells in the pod quickly "so it won't seem as if we just targeted his cell." [Id.].

In April 2020, Aguilar continues, Officer Veney told him that the officers at NNRJ had been directed not to give or collect from Aguilar any request or grievance forms. [Id. ¶ 59]. According to Aguilar, Veney complied with this order and refused to take three grievance

4

appeals to the superintendent. [Id.]. The next day, Aguilar adds, another officer told him that Captain English ordered NNRJ staff to limit the number of request forms given to Aguilar by providing them only every other Wednesday. [Id. ¶ 60].

## II. The Motion to Dismiss

### A) Standard of Review

Defendants move to dismiss the complaint under Federal Rule of Civil Procedure 12(b)(6). A plaintiff can survive a motion to dismiss only if the complaint alleges sufficient facts "to state a claim to relief that is plausible on its face." Bing v. Brivo Sys., 959 F.3d 605, 616 (4th Cir. 2020) (quoting Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)). In evaluating a motion to dismiss, the complaint's factual allegations are accepted as true. See Erickson v. Pardus, 551 U.S. 89, 94 (2007). When a complaint is filed by a litigant proceeding pro se, like Aguilar, the allegations must be liberally construed and "held to less stringent standards than formal pleadings drafted by lawyers." Id. In addition to the allegations set forth in the complaint, exhibits attached to the complaint may be considered. See Goines v. Valley Cmty. Servs. Bd., 822 F.3d 159, 165–66 (4th Cir. 2016); Fed. R. Civ. P. 10(c).

### B) Conspiracy Claim

Defendants argue that the complaint fails to plausibly allege a conspiracy to violate Aguilar's civil rights and, thus, the conspiracy claim must be dismissed. "To establish a conspiracy under § 1983, the plaintiff must show that the Defendants acted jointly in concert and that some overt act was done in furtherance of the conspiracy which resulted in [the] deprivation of a constitutional right." Barrett v. Pae Gov't Servs., Inc., 975 F.3d 416, 434 (4th Cir. 2020) (internal quotation marks and citation omitted). To meet this "weighty burden," the complaint must allege sufficient facts to allow an inference that defendants "positively or tacitly came to a

mutual understanding to try to accomplish a common and unlawful plan." Hinkle v. City of Clarksburg, W. Va., 81 F.3d 416, 421 (4th Cir. 1996).

Defendants correctly assert that the complaint is deficient because it fails to allege that defendants had an agreement or meeting of the minds. Aguilar counters that "viewing the complaint and record as a whole, it is quite obvious . . . that [defendants] conspired to retaliate." [Dkt. No. 38, Pl. Br. Opposing Mot. to Dismiss, at p. 6]. But the alleged retaliatory acts are too disjointed to infer a common cause. First, Aguilar alleges that he was retaliated in different ways after engaging in unrelated protected activity: (1) filing grievances; (2) filing lawsuits; (3) using the law library; and (4) helping other inmates do those same activities. Second, other than the allegation that each defendant knew that Aguilar had been filing grievances and lawsuits, there is no thread linking the defendants' individual actions to a common plan. Thus, the conspiracy claim must be dismissed.

### C) Retaliation Claims

Defendants argue that the retaliation claims must be dismissed because the complaint does not allege that any action they took adversely affected Aguilar's protected speech. Because the complaint alleges that Aguilar was able to file a § 1983 suit to claim retaliation and continued to file grievances at the prison, defendants urge that Aguilar was not "deterred or impaired in his ability to submit grievances or file his lawsuits." [Dkt. No. 36, Def. Mot. to Dismiss, at p. 12].

Defendants are wrong. To state a claim for retaliation under the First Amendment, "a plaintiff must allege that (1) he engaged in protected First Amendment activity, (2) the defendant took some action that adversely affected his First Amendment rights, and (3) there was a causal relationship between his protected activity and the defendant's conduct." Martin v. Duffy, 977 F.3d 294, 299 (4th Cir. 2020) (internal quotation marks, alterations, and citation omitted).

Defendants' motion to dismiss focuses on element (2)—the alleged adverse action.[2] "For purposes of a First Amendment retaliation claim under Section 1983, a plaintiff suffers adverse action if the defendant's allegedly retaliatory conduct would likely deter a person of ordinary firmness from the exercise of First Amendment rights." Martin v. Duffy, 858 F.3d 239, 249 (4th Cir. 2017) (internal quotation marks, alterations, and citations omitted). Contrary to defendants' argument, Aguilar's "actual response to the retaliatory conduct is not dispositive of the question of whether such action would likely deter a person of ordinary firmness." Id. at 250 (internal quotation marks and citation omitted). Indeed, "because 'conduct that tends to chill the exercise of constitutional rights might not itself deprive such rights . . . a plaintiff need not actually be deprived of [his] First Amendment rights in order to establish First Amendment retaliation.'" Booker v. S.C. Dep't of Corr., 583 F. App'x 43, 44 (4th Cir. 2014) (quoting Constantine v. Rectors & Visitors of George Mason Univ. 411 F.3d 474, 500 (4th Cir. 2005)). Thus, the fact that Aguilar was able to file a § 1983 complaint to claim First Amendment retaliation and continued to submit grievances at the jail does not stymie his retaliation claim. Defendants have made no argument as to whether each alleged adverse action would likely deter a person of ordinary firmness from exercising First Amendment rights.[3] For that reason, defendants have not shown that Aguilar failed to state a claim for unlawful retaliation.

---

[2] In their reply brief defendants additionally argue that Aguilar did not engage in protected First Amendment activity when he filed grievances and used the law library. To the extent these arguments are not waived for raising them for the first time in the reply brief, see Wright v. Va. Peninsula Reg'l Jail Auth., No. 2:19cv189, 2020 WL 1055665, at *16 n.17 (E.D. Va. Mar. 4, 2020), they are nevertheless without merit. First, an inmate's "right to file a prison grievance free from retaliation [is] clearly established under the First Amendment." Booker v. S.C. Dep't of Corr., 855 F.3d 533, 545 (4th Cir. 2017). Second, an inmate has a First Amendment right to meaningful access to the courts, and one way an inmate may exercise that right is through using the law library. See Lewis v. Casey, 518 U.S. 343, 350–51 (1996).

[3] Defendants also have not put forth an argument about the causation element, and the Court expresses no opinion on whether the allegations in the complaint satisfy that element.

This conclusion does not apply, however, to Superintendent Hull. The Court agrees with Defendants that Aguilar has failed to allege that the superintendent took any direct action that violated plaintiff's constitutional rights. Aguilar insists, however, that Hull knew about Lieutenant English's unconstitutional activity and "allowed and encouraged" it. [Dkt. No. 38, Pl. Br. Opp. Summ. J., at 6].[4] To the extent Aguilar contends that the complaint states a claim for relief against Hull in his supervisory capacity, the Court concludes otherwise. To state a claim for relief based on supervisory liability, the complaint must allege facts demonstrating that (1) a supervisory official "knew that [a] subordinate was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury;" (2) the supervisory official responded in a manner that "showed deliberate indifference to or tacit authorization of the alleged offensive practices"; and (3) "there was an affirmative causal link between [the supervisor's] inaction and the constitutional injury." King v. Rubenstein, 825 F.3d 206, 224 (4th Cir. 2016) (internal quotation marks and citation omitted). Here, the complaint does not demonstrate that Hull knew that any subordinate was committing unlawful retaliation. Although Aguilar alleges that Hull was aware of various adverse actions supposedly committed by the other defendants, he does not allege that Hull knew that the other officers were taking those actions *because* Aguilar had filed

---

[4] Aguilar does not make this argument in his brief opposing summary judgment, but the Court observes that, in the complaint, Aguilar alleges that Superintendent Hull "blocked" the PREA hotline after Aguilar filed a PREA complaint against NNRJ staff, in an apparent attempt to impose individual liability on Hull. [Dkt. No. 14, Amended Compl. ¶ 32]. But "to establish [a] causal connection, a plaintiff in a retaliation case must show, at the very least, that the defendant was aware of her engaging in protected activity." Constantine, 411 F.3d at 501 (4th Cir. 2005). Here, because Aguilar has not alleged that Hull knew about his PREA complaint, he has not met the third necessary element to state a retaliation claim against Hull.

grievances and lawsuits. Indeed, an action taken by a prison guard, when taken for non-retaliatory reasons, may in fact be proper. See Howland v. Kilquist, 833 F.2d 639, 644 (7th Cir. 1987). Thus, the retaliation claims against Ted Hull will be dismissed.

## IV. Conclusion

For the reasons outlined above, and through an Order that will issue alongside this Memorandum Opinion, the defendants' motion to dismiss [Dkt. No. 34] shall be GRANTED in part, with respect to the conspiracy claims and the retaliation claim against defendant Ted Hull, and DENIED in part with respect to the retaliation claims against Major Phyllis Back, Sergeant Rebecca Barry, Captain Jonathan English, Officer Sigifredo Luna, Officer Jason Newsome, and Officer Ashley Veney.

Entered this 2nd day of June 2021.

Alexandria, Virginia

Anthony J. Trenga
United States District Judge