# IN THE UNITED STATES DISTRICT COURT FOR THE
# EASTERN DISTRICT OF VIRGINIA

### Alexandria Division

| | |
|---|---|
| **Oscar Contreras Aguilar**           ) | |
|     **Plaintiff,**           ) | |
| ) | |
| v.           ) | 1:19cv1634 (AJT/IDD) |
| ) | |
| **Major Phyllis Back,** *et al.*,           ) | |
|     **Defendants.**           ) | |

### MEMORANDUM OPINION

Defendants, Major Phyllis Back, Sergeant Rebecca Berry, Captain Jonathan English, Officer Sigifredo Luna, Officer Jason Newsome, and Officer Ashley Veney, move for summary judgment on plaintiff Oscar Contreras Aguilar's claims that these officers retaliated against him for exercising his First Amendment rights while confined at Northern Neck Regional Jail (NNRJ). [Doc. No. 46]. Aguilar, who is proceeding pro se, has received the notice required by Local Civil Rule 7(K) and *Roseboro v. Garrison*, 528 F.2d 309 (4th Cir. 1975), and he opposes the motion. [Doc. Nos. 46-14, 60]. Because no reasonable juror could conclude that any defendant engaged in unlawful retaliation based on the summary judgment record, defendants' motion will be granted.

### I. Background

*A) The Amended Complaint*

The surviving claims[1] from the verified amended complaint allege that the six remaining defendant-officers unlawfully retaliated against Aguilar after he engaged in protected First

---

[1] By Order dated June 2, 2021, the Court dismissed the claims against defendant Ted Hull. [Doc. No. 43]. By Order dated March 17, 2022, the Court dismissed all claims—but for the retaliation claims are addressed in this Memorandum Opinion—against the remaining six defendants. [Doc. No. 89].

Amendment activity. [Doc. No. 14, Amended Compl.]. In particular, Aguilar alleges that while he was confined at NNRJ intermittently throughout 2019 and 2020, he exercised his First Amendment rights by filing grievances and § 1983 lawsuits, as well as by assisting other inmates do the same. [*Id.* ¶¶ 15–19].

      B) *Summary Judgment Record*

           i. Aguilar's First Amendment Activity

In the verified amended complaint, Aguilar attests under penalty of perjury that at NNRJ he engaged in several activities that are protected by the First Amendment. [Amended Compl., at p. 26]. First, he explains that in early 2019, he filed a § 1983 lawsuit against Lieutenant Newsome and Officer Luna's brother, Lieutenant Eleazar Luna, and that these two officers received notice of this lawsuit by May 16, 2019, when they executed the waiver of service of summons. [*Id.* ¶ 16]; *see* Case No. 1:19cv118 (AJT/JFA) (Doc. Nos. 1, 15, 18, 19).

Second, Aguilar avers that he submitted numerous grievance and inmate request forms at NNRJ. None of the defendants deny having knowledge of Aguilar's grievance activity. Officers Veney, Luna, and Newsome deny knowledge of Aguilar writing grievances complaining about them in particular. [Veney Aff. ¶ 8; Luna Aff. ¶ 8; Newsome Aff. ¶ 12].

Defendants describe Aguilar's grievance activity as abusive. Sergeant English declares, for example, that "Aguilar has bombarded the jail with numerous inmate requests and grievances regarding the same topics that have repeatedly been responded to, addressed, and resolved." [English Aff. ¶ 36]. For this reason, on June 17, 2020, he directed officers to limit Aguilar to two request forms and two grievance forms each week. [*Id.*]. Aguilar avers that English gave this instruction one year earlier, in June 2019. [Amended Compl. ¶¶ 17–18]. Aguilar further avers that in February 2020, English instructed staff not to give to, or accept from, Aguilar any

grievance or request forms. [*Id.* ¶ 57]. For example, Aguilar avers that on April 8, 2020, Officer Veney refused to take three grievance appeals from Aguilar on the ground that she had been instructed not to. [*Id.* ¶ 59].

Third, Aguilar attests that in June 2019, he assisted F-pod inmates with filing § 1983 lawsuits and grievances. [Amended Compl. ¶ 19]. Major Back and Sergeant Berry deny knowing that Aguilar was engaged in this activity. [Back Aff. ¶ 5; Berry Aff. ¶ 16].

Fourth, Aguilar asserts that he filed a complaint under the Prison Elimination Report Act (PREA) using the jail's PREA hotline on December 6, 2019. [Amended Compl. ¶ 32]. Then, according to Aguilar, "[s]hortly thereafter, the jail's PREA hotline was blocked by defendant[] Back." [*Id.*].

Finally, Aguilar points to his use of the law library at NNRJ. On March 16, 2020, for example, the law library was brought to his cell. [Amended Compl. ¶ 50]. He then visited the law library on March 26 and 27. [*Id.* ¶¶ 53–55]. Aguilar alleges that Captain English has ordered that plaintiff be restrained with handcuffs while using the law library in retaliation for, and to deter, his using the law library. [*Id.* ¶ 56].

### ii. Housing Classification and Assignments

Several of Aguilar's retaliation claims are based on his housing assignments at NNRJ. He was confined at NNRJ during five separate periods: (1) June 8, 2018 to October 15, 2018; (2) November 29, 2018 to December 6, 2018; (3) February 27, 2019 to August 5, 2019; (4) October 23, 2019 to December 20, 2019; and (5) February 10, 2020 to June 6, 2020. [Newsome Aff. ¶ 8 (as corrected by Aguilar in Pl. Opp'n to Summ. J. ¶ 18)].

Defendants have submitted sworn affidavits attesting to their respective roles in inmate classification and housing at NNRJ and the reasons for why Aguilar was placed in particular

pods. For instance, Sergeant Berry attests that she conducts classification assessments when inmates arrive at NNRJ, but she is not involved with inmate movements after their initial housing assignments are made. [Berry Aff. ¶ 10]. She explains that classification assessments, which are conducted when inmates arrive at NNRJ, are made by considering an inmate's charged offense, criminal history, escape history, institutional discipline history, gang involvement, mental health, violence, any special needs, and "known enemies." [*Id.* ¶ 5]. Additionally, for arriving federal inmates like Aguilar, the United States Marshals Service (USMS) provides NNRJ with a custody report that identifies known gangs and individuals that must be kept separate from the arriving inmate for safety and security reasons. [*Id.* ¶ 6].

Captain English is the Chief of Security and a member of the Institutional Classification Committee (ICC). [English Aff. ¶¶ 3, 11]. He attests that he is involved with housing assignments when there is a security incident; otherwise, he says, the classification division handles housing assignments. [*Id*. ¶ 6]. When there is a security incident, English or someone in his chain of command will place the implicated inmates in "an appropriate housing unit." [*Id*.]. English attests that E-pod and O-pod are used for disciplinary segregation, administrative segregation, and overflow housing, and that the level of restrictions that an inmate faces in these pods is based on the individual's circumstances, so one inmate may have more restrictions than another, even though they are in the same pod. [*Id*. ¶ 8]. According to English, all inmates in administrative segregation are "cuffed and/or shackled" when they leave the housing unit, and that Aguilar was not cuffed or shackled while in the day room of his housing unit or while in his cell. [*Id*. ¶ 25].

As for Aguilar's housing, a pre-classification assessment conducted on February 26, 2019—the day before Aguilar arrived for his third stint at NNRJ—recommended that he be

housed in D-pod, and he was placed there. [Berry Aff. ¶ 7]. A few days after he arrived, on March 5, 2019, Sergeant Berry conducted an initial classification assessment for Aguilar, and recommended that he be housed in maximum security general population. [*Id*. ¶ 8]. Thus, Aguilar could remain in D-pod, which, along with F-pod, housed maximum security inmates at NNRJ. [*Id*. ¶¶ 8, 9].

Aguilar later was housed in F-pod from June 11 to June 21, 2019 and then again from June 26 to July 2, 2019. [English Aff. ¶ 13]. Aguilar attests that while in "booking" on July 2, he asked Major Back why she was moving him to D-pod, where he "had problems (beef) with multiple inmates," and she replied, "You are disrupting the operations of this facility and you are persuading and helping inmates in F-pod to file lawsuits." [Amended Compl. ¶ 21]. When Back asked him to identify specific persons, Aguilar attests, he told her, "I don't know their names, all I know is that there are like 7 of them and they all from D.C." [*Id*.]. Then, according to Aguilar, Back ordered guards to escort him to D-pod, despite Aguilar's request to be placed in administrative segregation or "P.C." [*Id*.].

Major Back testifies that she is not involved in the initial classification of inmates, placement of inmates after security incidents, or day-to-day housing movements between cells, and thus played no role in Aguilar's transfer to D-pod on July 2, 2019; that move, she says, was ordered by classification. [Back Aff. ¶¶ 8, 15]. Back contends that she had asked Aguilar "several times to identify individuals he was 'beefing' with or that he believed posed a threat to him," but "[h]e never provided any names or gang affiliations." [*Id*. ¶ 18]. She adds that Aguilar was never housed with any individual or group listed on his "keep separate" list. [*Id*. ¶ 20]. An inmate's keep-separate list is a record of specific individuals or gangs that pose a danger to, or are at risk of harm from, that inmate, or that, if together with that inmate, would pose a risk to

5

others. [English Aff. ¶ 17]. For a name or group to be added to an inmate's keep-separate list, NNRJ must know the name of the individual or group. [*Id*.]. Captain English attests that "[i]t is not possible or appropriate to segregate inmates based on their geographical origins," so all inmates from D.C. could not be added to Aguilar's keep separate-list. [*Id*.].

Aguilar attests that while in D-pod on July 13, 2019, "D.C. gang members" entered his cell, and one tried to stab him with a shank. [Amended Compl. ¶ 23]. According to Aguilar, while acting in self-defense he stabbed that gang member with the shank. [*Id*.]. Captain English attests that he reviewed video footage of the altercation, and it shows that Aguilar had an object in his hand and made "stabbing motions" toward another inmate, identified as Terell Kelly. [English Aff. ¶ 18]. After the fight Kelly was taken to medical to be treated for multiple stab wounds. [*Id*.]. Both English and Major Back aver that they had no previous knowledge that Kelly and Aguilar posed a threat to each other, nor was Kelly on Aguilar's keep-separate list. [*Id*. ¶ 29; Back Aff. ¶ 28]. Additionally, and without any supporting evidence, Aguilar declares that "DC gang is a Gang (STG) recognized even by the Bureau of Prisons," and that "Berry, Back, and English are well aware of this fact." [Aguilar Opp'n to Summ. J. ¶ 42]. Berry, Back, and English deny being aware of a "D.C. gang" or inmates that identify as members of that gang. [Berry Aff. ¶ 11; English Aff. ¶ 21; Back Aff. ¶ 16 *Id*.].

Captain English moved Aguilar to O-pod two days after the altercation, on July 15, 2019, and Aguilar remained there until he left NNRJ on August 5, 2019. [English Aff. ¶ 13]. When Aguilar returned to NNRJ on October 23, 2019, he was housed in E-pod until he left on December 20, 2019. [*Id*.]. When Aguilar retuned on February 10, 2020, the USMS instructed NNRJ that Aguilar could not be around inmates in the MS-13 or 18th Street gangs. [Berry Aff. ¶ 17]. Berry attests that this restriction, plus the fact that Aguilar was classified as a maximum-

6

security inmate, meant that, at the time, "administrative segregation was the only way to ensure that Mr. Aguilar did not come into contact with these gang members." [*Id.*]. As a result, during Aguilar's remaining stays at NNRJ from February 10, 2020, through June 30, 2020, he was housed either in E-pod or O-pod. [English Aff. ¶ 13].

In Aguilar's view, his placements in E-pod and O-pod amounted to "indefinite ad seg" because he was not afforded hearings. [Amended Compl. ¶ 40]. Captain English attests that the ICC reviewed his segregation status every fifteen days. [English Aff. ¶¶ 11, 15]. Accordingly to English, the ICC, of which he is but one of several members, must unanimously decide to keep an inmate in segregation. *Id.* ¶ 11]. He further attests to the reasons why the ICC concluded that Aguilar was unfit for general population. During the period between October 23, 2019 and December 23, 2019, Aguilar had threatened jail staff and other inmates. [*Id.* ¶ 14]. During the period between February 10, 2020 through June 30, 2020, Aguilar continued making threats, including by threatening the life of a former Assistant U.S. Attorney (AUSA), as well as inmates, for example, warning that he "would send the 'D.C.' inmates out on a stretcher." [*Id.* ¶ 15]. During that period Aguilar also masturbated in front of female guards, knowing they were in the pod, and threw his lunch tray at another inmate. [*Id.*] Additionally, holes were discovered in his cell walls. [*Id.*]

Aguilar describes the conditions imposed on him in administrative segregation as "punitive." [Amended Compl. ¶ 40]. He declares, for example, that Captain English will not allow him to have razors or shave himself, and he is handcuffed and shackled "every time [he] goes anywhere." [*Id.* ¶¶ 40–41]. Aguilar concedes, however, that unlike prisoners in disciplinary segregation, he can order food from canteen and "come out for one hour a day." [*Id.* ¶ 42]. English reiterates that Aguilar was subjected to heightened restrictions because he had a history

7

of acting violently at NNRJ, including fighting with inmates, threatening self-harm, and threatening officers and inmates, as well as incidents in which he had been found possessing shanks and carving holes into his cell wall. [English Aff. ¶ 26].

Finally, Aguilar insists that English ignored his requests to see a psychologist in March 2020. [Amended Compl. ¶ 40]. English attests that he is not involved in inmate mental-health treatment at NNRJ and never denied Aguilar's request to see a mental-health provider. [English. Aff. ¶ 37].

### iii. Searches of Aguilar and His Cell

Aguilar also brings retaliation claims based on two searches. First, he avers that on December 7, 2019—the day after using the PREA hotline to file a complaint—Officer Newsome and two other officers "aggressively" searched his cell. [Amended Compl. ¶ 32]. Aguilar further declares that, during the search, Newsome said, "you like filing complaints, huh?" [*Id.*]. The officers found no contraband during the search. [*Id.*; Newsome Aff. ¶ 11]. For his part, Newsome avers that he is not involved with PREA complaints at NNRJ, and he had no knowledge of any PREA complaints that Aguilar filed. [Newsome Aff. ¶ 6]. He further attests that on December 7, he was asked to search Aguilar's cell to locate an item that was observed being passed from F-pod to Aguilar in E-pod. [*Id.* ¶ 11].

Second, Aguilar attests that on March 16, 2020, while he was using the mobile law library in his cell, Officer Veney yelled "I smell smoke," and unplugged the extension cord from the law library. [Amended Compl. ¶ 50]. Aguilar avers that he was then cuffed and removed from his cell while Officer Luna and another officer "aggressively" searched Aguilar's cell for thirty-five to forty minutes, read through his legal paperwork, and removed items (including a filled-out grievance form) and the law library. [*Id.*]. Aguilar further avers that Veney directed

Luna to search Aguilar for contraband but none was found. [*Id*.]. The officers accused Aguilar of smoking, which Aguilar denies. [*Id*.]. When the officers were leaving, Aguilar continues, Veney told Luna and the other guards to search the other two cells in O-pod "so it won't seem as if we just targeted his cell." [*Id*.]. According to Aguilar, the officers spent only five to ten minutes searching the other two cells. [*Id*. ¶ 51]. In Aguilar's view, it "is clearly obvious that Veney and Luna targeted [Aguilar's] cell for his use of the law library." [*Id*.].

In their affidavits, Officer Veney and Officer Luna recount the search differently. Veney avers that on March 16, 2020, she smelled smoke in the O-pod housing unit, and called for back-up officers because, as a female officer, she cannot go into the housing units by herself to conduct searches. [Veney Aff. ¶ 11]. She adds that "inmates have used the electrical wires from the law library to ignite things, including contraband." [*Id*. ¶ 10]. Officer Luna assisted with the search. [Luna Aff. ¶ 10]. The two officers both aver that they observed that Aguilar's eyes were bloodshot and red. [*Id*.; Veney Aff. ¶ 12]. Afterwards, the officers went upstairs to search the remaining two cells. [Veney Aff. ¶ 12]. They deny reading Aguilar's legal paperwork or removing items from his cell. [*Id*. ¶ 13; Luna Aff. ¶ 11].

## II. Standard of Review

Summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A dispute is genuine if a reasonable jury could return a verdict for the nonmoving party," and "[a] fact is material if it might affect the outcome of the suit under the governing law." Hupp v. Cook, 931 F.3d 307, 317 (4th Cir. 2019) (internal quotation marks and citations omitted). In evaluating a summary judgment motion, the Court views the evidence, and draws all inferences,

9

in the light most favorable to the nonmoving party, here, Aguilar. See E.W. by T.W. v. Dolgos, 884 F.3d 172, 178 (4th Cir. 2018).

### III. Analysis

Defendants move for summary judgment on Aguilar's retaliation claims. From the meandering, amended complaint, defendants have parsed that Aguilar seeks to claim that each defendant committed the actions described below in retaliation for Aguilar's First Amendment activities at NNRJ: (1) Captain English (a) limited Aguilar's access to grievance and request forms, (b) kept him housed in administrative segregation and, while there, imposed punitive conditions; (c) intentionally moved inmates with whom Aguilar was "beefing" into Aguilar's housing pod, and (d) ignored Aguilar's requests to see a mental health professional [Doc. No. 46-1, Defs.' Summ. J. Br., at p. 23]; (2) Major Back (a) moved Aguilar into a pod knowing that Aguilar was "beefing" with inmates there and ignored his requests to be housed in administrative confinement or protective custody, (b) at a later date, placed Aguilar in administrative segregation only for retaliatory reasons, and (c) "blocked" the PREA hotline after Aguilar used it to make a complaint [Id. at p. 25]; (3) Sergeant Berry kept Aguilar housed in administrative segregation [Id. at p. 26–27]; (4) Officer Newsome "aggressively" searched Aguilar's cell the day after he made a PREA complaint [Id. at p. 28]; (5) Officer Veney fabricated that she smelled smoke as a pretext for removing the law library from Aguilar's cell [Id. at p. 29]; and (6) Officer Luna, on March 16, 2020, "aggressively" searched Aguilar's cell, removed papers, and read his legal paperwork [Id. at p. 30].[2]

Defendants may prevail if the undisputed evidence refutes one of the following elements of a First Amendment retaliation claim: (1) plaintiff engaged in protected First Amendment

---

[2] Aguilar does not contest defendants' construction of his claims.

activity, (2) the defendants took some action that adversely affected plaintiff's First Amendment rights, and (3) there was a causal relationship between the plaintiff's protected activity and the defendants' conduct. *Martin v. Duffy*, 977 F.3d 294, 299 (4th Cir. 2020). It is undisputed that Aguilar engaged in protected First Amendment activity by filing lawsuits and grievances. The Court will address the remaining applicable elements at issue for each defendant in turn.

A) Claims against Captain English

Defendants argue that the undisputed facts do not support a First Amendment retaliation claim against Captain English. The Court agrees.

The Court begins with Aguilar's claim about the limitation on grievance and request forms that English imposed. Although the parties dispute when this limitation began (June 2019 versus June 2020), the Court will assume for the sake of argument that it started on the earlier date provided by Aguilar. "A retaliation claim under 42 U.S.C. § 1983 must establish that the government responded to the plaintiff's constitutionally protected activity with conduct or speech that would chill or adversely affect his protected activity," but "[n]ot every government restriction . . . is sufficient to chill the exercise of First Amendment rights, nor is every restriction actionable, even if retaliatory." *The Balt. Sun Co. v. Ehrlich*, 437 F.3d 410, 416 (4th Cir. 2006) (internal alteration, quotation marks, and citation omitted). The Fourth Circuit has opined that cutting off an inmate's access to the prison's grievance procedure would not support a First Amendment retaliation claim. *See Adams v. Rice*, 40 F.3d 72, 75 (4th Cir. 1994). Here, Aguilar still had access to NNRJ's grievance system, just limited access. Additionally, the evidence supporting a viable retaliation claim must show that the defendant took an adverse action that is sufficiently serious and resulted in some concrete harm to the plaintiff. *See Shapiro v. McManus*, 203 F. Supp. 3d 579, 596 (D. Md. 2016) (citing *Zherka v. Amicone*, 634 F.3d 642, 646 (2d Cir.

11

2011) and *Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 500 (4th Cir. 2005)). In fact, Aguilar has not identified any harm he suffered, other than generically stating that English's actions "are causing plaintiff unnecessary physical, emotional, and mental distress, suffering, and injury." [Amended Compl. ¶ 79].

Next, the undisputed record does not show that Captain English imposed punitive conditions on Aguilar while he was housed, indefinitely, in administrative segregation, and thus, this allegation cannot be used to support the "adverse action" component of a retaliation claim. The evidence reveals that Aguilar's administrative segregation was reviewed by the ICC every fifteen days. Aguilar does not dispute that the ICC reviewed his segregation. Instead, he seeks to impugn the ICC review's integrity because he was not afforded a hearing; he does not contend the defendants would have a reached a different decision (provide a hearing) had he not engaged in First Amendment activity. *See Martin*, 977 F.3d at 299. Thus, there is no evidence to support a causal connection between English's actions and Aguilar's protected conduct.

Additionally, defendants have provided the reasons behind Aguilar's segregation conditions, namely, his many incident reports that have involved fighting with inmates, possessing shanks, attempting escape, and threatening officers, inmates, a former AUSA, and self-harm. Aguilar attempts to put these reasons in dispute by characterizing the cited incidents as "petty" and urging that his actions were not meant to threaten the AUSA or to attempt an escape. [Pl. Opp'n to Summ. J. ¶ 78]. In downplaying the nature of his actions, however, Aguilar tacitly concedes that they occurred. In any event, Aguilar's assertions are insufficient to create a material dispute of fact that would preclude summary judgment. "Prison officials must be free to take appropriate action to ensure the safety of inmates and corrections personnel and to prevent escape or unauthorized entry." *Bell v. Wolfish*, 441 U.S. 520, 547 (1979). This Court will not

second-guess the security measures NNRJ imposed on Aguilar with only his bald contention that his menacing actions were misunderstood.

Finally, Aguilar's claim that Captain English ignored his request to see a psychologist fails the causation element of a First Amendment retaliation claim. The undisputed record establishes that English is not responsible for ensuring that inmates receive mental-health care. Aguilar insists that English has "circumvented [his] access to mental health" by claiming that Aguilar is "too dangerous." [Pl. Opp'n to Summ. J. ¶ 93]. This contention is insufficient to create a material dispute of fact because Aguilar has not explained with specificity how English ever hindered his ability to obtain care, such as by preventing him from making or getting to an appointment with a mental-health professional. Thus, the record shows only that English did not obtain mental-health care for Aguilar because his job does not encompass that responsibility.

B) Claims against Major Back

Next, defendants argue that summary judgment is warranted in Major Back's favor because the undisputed facts do not support the causation element of a First Amendment retaliation claim. They contend that Aguilar was placed in D-pod on July 2, 2019, by classification, not Back, and, further, that he was placed in administrative segregation because of his own behavior. Additionally, they assert that Back was unaware that Aguilar had filed a PREA complaint.

Aguilar disputes that Major Back was not involved with his placement in D-pod because she told him he was being moved out of F-pod because he was "disrupting the operations of this facility and [was] persuading and helping inmates in F-pod to file lawsuits." [Amended Compl. ¶ 21]. Back denies saying this, but even assuming for the sake of argument that she did, *and* drawing the inference that she was behind Aguilar's transfer to D-pod, the undisputed evidence

13

does not demonstrate that the transfer amounted to an adverse action that would chill First Amendment activity.

"Since transfers are common among prisons, ordinarily a transfer would not deter a prisoner of ordinary firmness from continuing to engage in protected conduct." *Hoye v. Gilmore*, 691 F. App'x 764, 765 (4th Cir. 2017) (quoting *Siggers-El v. Barlow*, 412 F.3d 693, 701 (6th Cir. 2005)). But "a prison transfer . . . can be an adverse action if that transfer would result in *foreseeable*, negative consequences to the particular prisoner." *Hill v. Lappin*, 630 F.3d 468, 474 (6th Cir. 2010) (emphasis added). Here, there is no evidence that it was reasonably foreseeable to Back that Aguilar faced any threats of harm in D-pod. It is undisputed that Aguilar failed to provide specific information about who he feared in D-pod. In fact, Aguilar concedes that he never provided Back with the name of any specific individuals he was supposedly "beefing" with there. Moreover, despite Aguilar's insistence that a "D.C. gang" exists, he has never identified any specific inmates who belong to the gang, and Back avers that she has no knowledge of the existence of such a gang. Further, it is undisputed that Aguilar was never housed with any gang or person on his keep-separate list. No reasonable juror could conclude, based on this undisputed evidence, that Back would have foreseen that Aguilar faced any specific or imminent threat in D-pod, so the transfer to D-pod cannot, as a matter of law, be considered an adverse action that would support a retaliation claim.

To the extent Back was involved in the decision to house Aguilar in administrative segregation, which could deter a person of ordinary firmness from exercising First Amendment rights, *see Martin v. Duffy*, 858 F.3d 239, 250 (4th Cir. 2017), the undisputed evidence does not establish a retaliatory motive. The causation element of a retaliation claim is defeated when the undisputed evidence shows that the defendant "would have reached the same decision . . . in the

absence of the protected conduct." *Martin*, 977 F.3d at 299 (quoting *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977)). Defendants have testified that Aguilar's numerous misdeeds caused his segregation. And the record is replete with examples of Aguilar misbehaving in ways that threaten the security of the jail, including making threats, possessing shanks, and fighting with inmates. Based on this evidence, no reasonable juror could conclude that Aguilar's placement in administrative segregation was done for retaliatory reasons instead of legitimate ones.

Lastly, Back argues that her undisputed testimony establishes that she neither knew that Aguilar had filed a PREA claim, nor blocked the PREA hotline in retaliation for Aguilar filing the claim. Aguilar contends that a dispute of fact precludes summary judgment because, he declares, Back processes PREA complaints at NNRJ. Even if that were true, Aguilar has not provided any evidence that Back blocked the PREA hotline outside of his own say-so. "Summary judgment . . . is the 'put up or shut up' moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of the events." *Propst v. HWS Co.*, 148 F. Supp. 3d 506, 511 (W.D.N.C. 2015) (quoting *Hammel v. Eau Galle Cheese Factory*, 407 F.3d 852, 859 (7th Cir. 2005)). Here, Aguilar has not attested to how he has personal knowledge of the supposed fact that Back blocked the PREA line. To create a genuine issue of material fact, "an opponent of summary judgment 'must do more than simply show that there is some metaphysical doubt as to the material facts.' He 'must come forward with 'specific facts showing that there is a genuine issue for trial.'" *F.D.I.C. v. Cashion*, 720 F.3d 169, 181 (4th Cir. 2013) (quoting *Matsushita Elec. Indus. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986)). Because Aguilar has not come forth specific facts related to Back's alleged involvement in blocking the PREA line, she is entitled to summary judgment.

C) Claim against Sergeant Berry

Defendants next argue that summary judgment is warranted for Sergeant Berry on Aguilar's claim that she kept him housed in administrative confinement indefinitely because of his history of filing grievances, filing lawsuits, using the law library, and assisting other inmates with their grievances and lawsuits. Defendants urge that Berry classified Aguilar for administrative segregation for legitimate and permissible reasons based on his security risk to himself and others.

The undisputed evidence defeats the causation element of Aguilar's retaliation claim against Sergeant Berry. The evidence demonstrates that Berry is involved with the initial classification of inmates when they enter NNRJ. She attests that she made the decision to place Aguilar in administrative segregation when he returned to NNRJ on February 10, 2020. For Aguilar's return on October 23, 2019, she avers only that his housing was reviewed by Classification, and he was assigned to administrative segregation. Aguilar contends that Berry made the decision. Even if the Court assumes that she was involved with both decisions, there is sufficient undisputed evidence to support both decisions to place Aguilar in administrative segregation.

For the October 23 classification, Aguilar contends that the decision was wrongly based on the incident in July 2019 when he stabbed another inmate in D-pod, which, in his view, occurred only because Berry and Major Back knowingly placed him in that pod with inmates who presented a danger to him. The Court has already concluded that the evidence does not establish such knowledge on the part of NNRJ staff, rendering meritless Aguilar's argument that the stabbing should not have been used to support his placement in segregation when he entered NNRJ in October 2019. As for the February 2020 placement, Berry attests that the USMS had

16

instructed that he could not be around members from two gangs, so that restriction, plus Aguilar's need for maximum-security housing, meant that administrative segregation was the only appropriate housing for him at the time. Aguilar does not dispute these facts.

As for whether Sergeant Berry impermissibly kept Aguilar in administrative segregation "indefinitely," the Court has already concluded that Aguilar received periodic review of his confinement, so he cannot proceed under that theory for his retaliation claim. All told, because the undisputed evidence establishes that Berry would have reached the same decision irrespective of Aguilar's protected conduct, he cannot meet the causation element of the retaliation claim against Berry as a matter of law.

D) Claim against Officer Newsome

Defendants next argue that Aguilar's claim against Officer Newsome fails because one search of his cell cannot, as a matter of law, constitute an adverse action to support a retaliation claim.

The Court agrees with defendants. District courts within the Fourth Circuit have held that "a routine cell search, without more, is not sufficiently adverse to satisfy the second element of a retaliation claim." *Mateen v. Collins*, No. 7:19cv620, 2021 WL 4432517, at *4 (W.D. Va. Sept. 27, 2021) (citing cases). Although Aguilar describes the search as "aggressive," without facts explaining how the search went beyond routine, this Court cannot conclude that the cell search, as conducted here, would deter a person of ordinary firmness from exercising First Amendment rights, particularly given that inmates have no expectation of privacy in their cells. *See Hudson v. Palmer,* 468 U.S. 517, 526 (1984).

E) Claim against Officer Veney

Next, defendants contend that the undisputed evidence does not support a retaliation claim against Officer Veney. In particular they argue that, in removing the mobile law library from his cell, she did not commit an adverse action that would chill protected speech.

The Court agrees with defendants that, as a matter of law, a "one-time ejection from the law library . . . [is] de minimis conduct that did not constitute adverse action." *Meeks v. Schofield*, 625 F. App'x 697, 701–02 (6th Cir. 2015). The Court therefore will grant summary judgment for Officer Veney.

F) Claim against Officer Luna

Lastly, defendants urge that the undisputed evidence does not establish that, during the March 16, 2020, search of Aguilar's cell, Officer Luna removed papers and read his legal paperwork in retaliation for using the law library.

As the Court observed above, a routine cell search, "without more," does not amount to an adverse action for the purposes of a First Amendment retaliation claim. *Mateen*, 2021 WL at *4. Moreover, courts have found that even the confiscation of materials—including legal documents—from a cell does not amount to the "more" that would rise to the level of an adverse action. *See e.g., Edwards v. King*, No. 7:21cv47, 2021 WL 1396463, at *2 (W.D. Va. Apr. 13, 2021) (concluding that officer confiscating legal affidavit that plaintiff-inmate planned to use in lawsuit did not amount to adverse action);, No. 7:01cv410, 2002 WL 32074716, at *7 (W.D. Va. May 2, 2002), *aff'd Ballance v. Angelone*, 46 F. App'x 223 (4th Cir. 2002) (opining that "[a] cell shakedown and the alleged confiscation of material, whether or not it was done in response to filing of a lawsuit, is not sufficiently adverse . . . to constitute retaliation"). The Court finds this reasoning applicable here, particularly because Aguilar does not explain what harm he suffered as a result of the search. Summary judgment will therefore be awarded to Officer Luna.

18

## IV. Conclusion

For the reasons outlined above, and through an Order that will issue alongside this Memorandum Opinion, the defendants' motion for summary judgment [Doc. No. 46] will be granted.

March 23, 2022
Alexandria, Virginia

Anthony J. Trenga
United States District Judge

19